**MONARCH WAREHOUSE COMPANY,
Appellant,**

v.

**MAJOR BRECKINRIDGE CORPORA-
TION, Appellee.**

Court of Appeals of Kentucky.

Jan. 31, 1975.

William G. Lehnig, Louisville, for appellant.

Fred M. Goldberg, Goldberg & Lloyd, Louisville, for appellee.

FAUST Y. SIMPSON, Special Commissioner.

This is an appeal from a judgment granting a directed verdict to the appellee on a complaint by appellee for damages against appellant for the loss of bailed merchandise.

The appellant, Monarch Warehouse Company, operated a modern warehouse in the City of Louisville. Prior to April, 1967, Major Breckinridge by contract with Monarch stored a number of color television sets in appellant's warehouse. On April 30, 1967, there was a break-in at the warehouse and a number of appellee's television sets were stolen of the value of $9,523.82.

Upon appellant's failure to deliver the sets or their value to appellee, this action

was instituted. At the first trial held on April 20 and 21, 1970, the issues were submitted to a jury which found unanimously in favor of Monarch. On Major Breckinridge's motion the trial judge granted a new trial. At the second trial substantially the same evidence was presented as in the first trial and at the close of all the evidence the trial court directed a verdict in favor of Major Breckinridge, and this appeal followed.

The warehouse in question was a modern, well constructed building of brick and concrete block. The storage area consisted of two buildings at the rear of the main building about forty or fifty feet apart. The property was fenced on three sides with a cyclone fence, eight or ten feet high, with barbed wire on top. The entire area was lighted by floodlights. There were two gates at the front which were padlocked at night. There were no other gates. The side that was not fenced was bounded by a building of another company.

No night watchmen were employed to guard the buildings. Prior to the burglary in question the warehouses were protected by an ADT system with contacts on all the perimeter doors and some internal doors. This system operated by a magnet being attached to the door and one to the wall and when the door was moved it broke contact, sending an alarm to the ADT office down town.

The company had a break-in on September 19, 1966, in which some television sets were stolen. It was determined that the burglar-alarm system was sidetracked by the burglars. Thereafter, Monarch contracted with ADT to install an additional burglar system called an ultra-sonic system. Merchandise was stored in the buildings on pallets arranged in rows across the room, leaving aisles around the perimeter of the room and in between the merchandise. The ultra-sonic system operated by placing what were called transducers around the perimeter of the building. At one end of the building would be a sending unit and at

the other end would be a receiving unit. These units were so arranged that any movement in the aisles would set off an alarm. There were about twenty-two units to a building. The alarm would send a signal to the ADT central office down town.

Before leaving the warehouse at night the system would be activated by an employee. After activating the system he would stand motionless to determine if the system was working. If it was working a signal would be flashed to the down town office and the down town office would in turn activate a buzzer in the warehouse to let the employee know the system was working.

It developed that the system was extremely sensitive and several false alarms were given. It was thought at times that birds flying through the warehouse might be setting it off. Between two of the buildings was a railroad siding and it was thought that the vibration from the trains might be setting it off. It was suggested that placing some merchandise next to the wall would buffer the system from the railroad vibration and decrease the sensitivity of the system. This was done in the building next to the railroad siding but not in the building of the break-in.

According to the testimony, the only problem with the system was that it was over-sensitive; that it was picking up signals and sounding alarms when there was no burglary. For this reason, Monarch had never accepted the system as satisfactory.

On the night of April 30, 1967, the alarm went off and the ADT offices were alerted. By the time the security officers arrived a burglary had been partly achieved. A panel had been cut in the cyclone fence and two holes knocked in the concrete walls of one building, and about twenty-two colored television sets were missing and ten sets strewn outside in the grass between the buildings and the fence. One of the holes appeared to be too small for the

sets to have been removed through. There appeared to be some metal drums stacked at this point that blocked the entry. Farther down the wall another hole was knocked which was larger and apparently the point of entry. There was nothing stacked in front of this hole, but some bagged chemical material appeared to be stacked on each side. Monarch officials admitted knowing that colored television sets were hot items during this period for burglars.

The law of bailments is clearly stated in Webb v. McDaniels, 305 Ky. 739, 205 S. W.2d 511, as follows:

"The rule is that where the relation of bailor and bailee for hire or mutual benefit exists, the bailee must exercise ordinary care and diligence in safeguarding the property and is liable for the injury to, or loss of, the property resulting from his failure to do so, but is not liable for the injury or loss of the property not resulting from negligence on his part, or that of his agents or employees . . ."

 In this jurisdiction the rule also is that once the bailor makes out a prima facie case and proves the bailed goods were damaged or lost, the bailee has the burden of proving that the loss resulted other than from his negligence. Welch v. L. R. Cooke Chevrolet Co., 314 Ky. 634, 236 S. W.2d 690, and D. H. Overmeyer Co. v. Hirsch Bros. & Co., Ky., 459 S.W.2d 598.

The only question to be resolved here is whether or not the evidence of the appellant was of sufficient quality to present the case to the jury. We are of the opinion the evidence was of such quality.

In Overmeyer, supra, we said:

"It has been observed in subsequent opinions that the procedural effect of a rebuttable presumption, or prima facie case, is not a shifting of the burden of proof, and the defending party need not adduce 'substantial' countervailing evidence in order to force submission of the issue to the fact-finder (whether it be a jury or the trial court). It is necessary only that his evidence inject enough doubt that it cannot be said that there is but one conclusion reasonable men could reach."

We think the testimony of appellant amply furnished this doubt. The evidence in the first trial was substantially the same as in this trial and the jury was correctly instructed. The case is reversed with instructions to the trial court to set aside the order and judgment directing a verdict and reinstate the original judgment.

All concur.